IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 25, 2020, at Jackson

**BRIAN CAMERON FRELIX v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County
Nos. 2014-C-2154, 2013-D-3070  Angelita Blackshear Dalton, Judge**

———————————————————

**No. M2019-01070-CCA-R3-PC**

———————————————————

After entering guilty pleas to aggravated robbery and facilitation of aggravated robbery, the Petitioner, Brian Cameron Frelix, sought and was denied post-conviction relief. The Petitioner appeals, asserting that he received ineffective assistance from his trial counsel when she did not file a motion to suppress a statement he had made to authorities in Williamson County. He also contends that the State violated his right to counsel because the inmate who was housed with him was a State agent who interrogated him without an attorney. After a thorough review of the record, we conclude that the Petitioner's trial counsel did not provide ineffective assistance and that his Sixth Amendment claim has been previously determined. Accordingly, we affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Daniel J. Murphy, Lewisburg, Tennessee, for the appellant, Brian Cameron Frelix.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Amy Hunter, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

In 2013, the Petitioner committed various robberies in Davidson and Williamson Counties. While the Petitioner was being held in Williamson County custody in March

2014, his cellmate, Mr. Michael Reynolds, urged him to confess his offenses to Brentwood Detective Alan Keller. The Petitioner gave statements at the Brentwood Police Department implicating himself in the Williamson County offenses and also in two separate robberies that took place in Davidson County. The Petitioner's counsel in Williamson County filed a motion to suppress his statements to police, arguing that Mr. Reynolds had been acting as an agent of Detective Keller. After a hearing, this motion was denied, and a jury convicted the Petitioner of various offenses in Williamson County. The Petitioner subsequently entered guilty pleas to his Davidson County offenses. The Petitioner's Williamson County attorney then appealed his convictions on various grounds, including error in denying the motion to suppress, and this court denied the appeal, finding that Mr. Reynolds was not an agent of the State and that the confessions were voluntary. *State v. Brian C. Frelix*, No. M2017-00388-CCA-R3-CD, 2018 WL 2722796, at *15 (Tenn. Crim. App. June 6, 2018), *perm. app. denied* (Tenn. Sept. 13, 2018). In Davidson County, the Petitioner filed a timely post-conviction petition, asserting that his Davidson County trial counsel was ineffective for not filing a motion to suppress his statements made in Williamson County and that his Sixth Amendment right to counsel was violated when he was interrogated by Mr. Reynolds. The post-conviction court denied the petition, and the Petitioner appeals.

**Procedural History**

We begin by reviewing the chronology of the Petitioner's offenses and legal proceedings. On October 12, 2013, the Petitioner participated in a home invasion and robbery in Williamson County. On October 14, 2013, the Petitioner, Mr. Dequan Hasani Bertrand, and Mr. Anthony Javon Jones entered a Belle Meade home and robbed the elderly victim, and the Petitioner assaulted the victim by hitting her with a gun. On the next day, October 15, 2013, Mr. Bertrand entered a Davidson County victim's home, took her possessions, and raped her at gunpoint while Mr. Ivy LaRue Dobson and the Petitioner, who was driving, waited nearby. The Petitioner was apprehended and incarcerated in Williamson County on October 16, 2013.

On November 8, 2013, the Petitioner, Mr. Bertrand, and Mr. Dobson were indicted for various offenses based on the October 15, 2013, Davidson County robbery in which the victim was raped. This indictment charged the Petitioner with aggravated robbery, aggravated burglary, employment of a firearm during the commission of or attempt to commit a dangerous felony, and attempted robbery of a second victim on October 15, 2013. On March 10, 2014, the Petitioner was indicted for numerous offenses stemming from the Williamson County robbery.

The Petitioner gave a statement to Williamson County authorities while in custody in Williamson County on March 26, 2014, implicating himself in the Williamson County

offenses and also the Davidson County offenses. On August 8, 2014, the Petitioner was indicted for multiple offenses in relation to the Belle Meade robbery during which he hit the victim with a gun.

On March 13, 2015, the Circuit Court for Williamson County held a hearing to determine whether the Petitioner's statements to authorities should be suppressed and denied the Petitioner's motion to suppress. The Petitioner went to trial in Williamson County on July 15, 2015, and was convicted of numerous offenses and sentenced to thirty-eight years in prison. His Williamson County attorney appealed, challenging, among other alleged errors, the denial of the motion to suppress.

On July 5, 2017, the Petitioner entered a guilty plea to one count of aggravated robbery as charged in the 2014 Davidson County indictment related to the Belle Meade offense in which the victim was hit with a gun. He also pled guilty to facilitation of aggravated robbery as a lesser-included offense of aggravated robbery for his role in the robbery and rape charged in the 2013 indictment. The Petitioner was sentenced to an out-of-range sentence of sixteen years for the Belle Meade aggravated robbery and a sentence of three years for the facilitation of aggravated robbery, and these sentences were to run concurrently with each other and with his thirty-eight-year sentence in Williamson County. This court affirmed the Petitioner's Williamson County convictions on June 6, 2018, and the Tennessee Supreme Court denied appeal on September 13, 2018. Meanwhile, the Petitioner filed a timely post-conviction petition on July 6, 2018. The post-conviction court subsequently held a hearing and denied relief.

### Williamson County Motion to Suppress

The Petitioner's Williamson County attorney moved to suppress his statements on several grounds, including that Mr. Reynolds was acting as an agent for the State, that Mr. Reynolds's interrogation of the Petitioner was a violation of his Sixth Amendment rights, and that Mr. Reynolds coerced the Petitioner into confessing through threats. Detective Alan Keller testified at the hearing that the Petitioner was in custody for the Williamson County crimes on March 12, 2014, when Detective Keller received a letter from Mr. Reynolds. Mr. Reynolds was brought in for an interview on March 20, 2014, and Mr. Reynolds offered information on the Petitioner's case, including numerous details that only someone who had been involved in the crimes would know. Detective Keller stated he had not had contact with Mr. Reynolds prior to receiving the letter. Mr. Reynolds requested for Detective Keller to put money on his commissary account, but Detective Keller did not do so. Detective Keller provided Mr. Reynolds food and drink, which he testified was standard practice for anyone brought in for an interview, whether or not they were incarcerated. He also told Mr. Reynolds he would discuss Mr. Reynolds's case with the prosecutor but could not make any promises or deals. Detective

Keller gave Mr. Reynolds two stamps from his desk drawer when Mr. Reynolds stated he needed a way to communicate. He also allowed Mr. Reynolds to use his telephone.

On March 26, 2014, Mr. Reynolds was brought back to the Brentwood police station and presented Detective Keller a letter written by the Petitioner. Because the Petitioner had written requesting to speak with police, the Petitioner was also brought to the station. Both inmates were fed. The Petitioner confirmed that the letter was his, and he stated that he did not want an attorney but wanted to have Mr. Reynolds present during the interview. The Petitioner was informed of his rights and signed a waiver indicating that he wanted to speak with Detective Keller. Detective Keller stated that the interactions between the Petitioner and Mr. Reynolds appeared cordial.

Detective Keller acknowledged that the letter requesting to speak to police was dated March 21, 2014, but not delivered until March 26th. He agreed that he probably told Mr. Reynolds he would "work on [his] charges" and that during the interview, Mr. Reynolds would remind the Petitioner of details of the crime. He also acknowledged he told Mr. Reynolds he would "look into" putting money in Mr. Reynolds's account, but stated he did not ever intend to give Mr. Reynolds money. The Petitioner and Mr. Reynolds were both permitted to use the telephone.

The Petitioner subsequently sent Detective Keller a letter around the first week of April. Detective Keller recognized the handwriting, and the letter referenced the prior interview. In the letter, the Petitioner never said he had made involuntary statements or was under duress during his confession. Detective Keller described Mr. Reynolds as around six feet tall and 220 pounds and described the Petitioner as approximately five feet, ten inches tall and 170 pounds.

Sergeant Carol Hughes testified that the Petitioner was taken into custody on October 16, 2013. Due to his erratic behavior, he was put into "lockdown" on October 30, 2013, and he was still there in March 2014. A report read by Sergeant Hughes indicated that one of the incidents leading to lockdown occurred when a detective from the Belle Meade Police Department attempted to interview the Petitioner for an ongoing investigation. Sergeant Hughes referenced records which indicated that Mr. Reynolds was placed in the Petitioner's cell on March 13, 2014, and removed from the cell on March 20, 2014.

Mr. Terry Wood, who was the prosecutor assigned to Mr. Reynolds's case, testified that Mr. Reynolds was charged with theft of services over $500 and identity theft as a result of visiting a medical center using a false name and date of birth. The theft charge was dismissed, the identity theft charge was reduced to criminal impersonation, and Mr. Reynolds was released from prison after having served forty-five days. Mr.

Wood testified that Mr. Reynolds got "[a] great deal" because while Mr. Wood would not necessarily have insisted on pursuing a felony charge when the amount, as in this case, was very close to $500, he would normally have required probation rather than a sentence to the time Mr. Reynolds had already served. Mr. Wood agreed that he would have checked into Mr. Reynolds's criminal history and that eight prior misdemeanor thefts would have "count[ed] against" him. Mr. Reynolds's attorney testified that Mr. Reynolds was on federal probation at the time of his Williamson County charges were resolved. Mr. Reynolds's attorney agreed that while it was common to obtain reduced charges, release without probation was "significant."

The Petitioner testified that his statements in the letters and to police were coerced by threats from Mr. Reynolds. He testified that drug withdrawal caused him to hallucinate and behave erratically and that he was placed in "lockdown," where he was only let out of his cell for one hour per day, for an extended period of time. According to the Petitioner, his mental health was fragile when Mr. Reynolds was placed in his cell. The Petitioner said Mr. Reynolds was larger than him and kept hounding him for information about his case. On March 20, 2014, Mr. Reynolds was absent for a time and explained that police were questioning him about the Petitioner's case. He asserted that police knew the Petitioner had tried to tell Mr. Reynolds something about Belle Meade. Mr. Reynolds then threatened the Petitioner's family and told the Petitioner, "[S]o if something happened to them because you want to play around with me, how would that make you feel?" He elaborated, "All I got to do is call somebody." The Petitioner testified that Mr. Reynolds had more access to a telephone than other inmates and that the Petitioner's motive in confessing was to keep his family safe.

At Mr. Reynolds's direction, the Petitioner wrote the March 21st letter to Detective Keller asking to speak to police. Mr. Reynolds kept the letter with him and would talk to the Petitioner every day to ask if he was ready to "do this" or "go through with this." The Petitioner was taken to the Brentwood police department on March 26th, and he was placed in a room with Mr. Reynolds. While he acknowledged that he never told police that he was afraid of Mr. Reynolds, even outside of Mr. Reynolds's presence, he explained that he was afraid that if he revealed the coercion, Mr. Reynolds would follow through with his threats.

The Petitioner testified that during the interview, Mr. Reynolds would "remind" him of things that did not happen, and the Petitioner asserted that he did not give any actual details of the crimes to Mr. Reynolds. Instead, he said Mr. Reynolds got details of the crime from the newspaper.

The Petitioner acknowledged that when he wrote the second, March 30th letter, in which he corrected a detail he had given police regarding the Belle Meade offenses, Mr.

Reynolds was no longer his cellmate.  He acknowledged that this letter averred the truth of all his prior statements.  He explained that Mr. Reynolds was at first in another pod and still sending him messages and that he did not know exactly when Mr. Reynolds was released.  He agreed that he thought his co-defendant, and not Mr. Reynolds, was giving detectives the details of the crime. Asked why he would be trying to negotiate a plea if he was innocent and his statement was involuntary, he said, "Because look at this county that I'm in."

This court summarized the interview between Mr. Reynolds and Detective Keller as follows:

> At the onset of the March 20 interview, Mr. Reynolds stated that he "hope[d]" that the officers would speak to the District Attorney on his behalf but that, ultimately, he was motivated to speak with the detectives because he was troubled by the thought of the eleven-year-old minor victim having a gun held against his head during the course of the offense. Detective Keller stated to Mr. Reynolds that he could not make any promises with regard to the disposition of Mr. Reynolds' pending cases. Mr. Reynolds responded that he understood.  Mr. Reynolds then provided details about the October [12] offense, such as how the intruders selected the house, how they entered, what occurred inside, and what the men did following the offense.  Mr. Reynolds then recounted events surrounding other burglaries and robberies under investigation in other counties.

> On the video recording, Mr. Reynolds suggested that he might be able to obtain more information from "Quan," one of the co-defendants. Detective Keller responded that he could not ask Mr. Reynolds to act as his agent.  Detective Keller stated that "if it happen[ed] on its own," that was "fine" but that he could not instruct Mr. Reynolds to speak with anyone. Mr. Reynolds stated that he understood. Detective Keller told Mr. Reynolds that the "case was good before" but that Mr. Reynolds' information "confirm[ed] everything."  Mr. Reynolds asked if it would be helpful for him to encourage the [Petitioner] to write down the information.  Detective Keller again responded that he "can't have [Mr. Reynolds] do that."  Mr. Reynolds then asked for a cigarette and another cup of coffee.  Mr. Reynolds stated that it cost him money to communicate with the detectives through mail and asked if someone would put ten or fifteen dollars in his account.  Detective Keller responded that he was not sure he could do anything in that regard but that he would "look into it."  He suggested other possible avenues for communication.

Detective Keller left the room to get coffee and when he returned, Mr. Reynolds asked about using a phone in the room. Detective Keller gave permission for use of the phone and then left the room. Mr. Reynolds placed a brief phone call inquiring about money to put in an account. He then placed two other calls that appeared to be to attorneys representing him in other counties. He left messages notifying them that he had spoken with police providing information on unrelated cases. He placed two unanswered calls and then spoke with a [woman] about letters he had written to her.

*Brian C. Frelix*, 2018 WL 2722796, at *3.

The March 26th recording of Mr. Reynolds's morning solo interview with Detective Keller reveals that Mr. Reynolds gave the Petitioner's March 21st letter to Detective Keller, who was able to identify the handwriting. Mr. Reynolds then revealed that the Petitioner had confided about criminal acts his co-defendants had committed without him, and Mr. Reynolds gave details of these crimes. Mr. Reynolds recounted that he had told the Petitioner that it was in the Petitioner's best interest to confess to the crimes and try to get his sentence reduced. The Petitioner wrote the letter asking to speak to police. Mr. Reynolds stated that in the following days, the Petitioner would sometimes ask for the letter back, but Mr. Reynolds would again convince him that delivering the letter was a good idea. On the morning of the interview, the Petitioner told Mr. Reynolds to ask Detective Keller to bring them McDonald's for lunch and told Mr. Reynolds to inform law enforcement that he would only talk to them if Mr. Reynolds was present. Mr. Reynolds told Detective Keller, "I hope this helps me on my stuff, too." Detective Keller responded that he would "work on" that by informing the District Attorney of Mr. Reynolds's cooperation.

This court summarized the Petitioner's March 26th interview as follows:

On the March 26, 2014 recording, Mr. Reynolds and the [Petitioner] were alone in the room, and Mr. Reynolds encouraged the [Petitioner] to be candid with the detectives and "don't hold nothing back." He told the [Petitioner] to "be truthful, man." The two appear to have a congenial relationship and, after an officer [brought] in food, the two [ate] lunch together. The [Petitioner] showed no observable sign of fear, discontent, or concern. Mr. Reynolds continued to advise and encourage the [Petitioner] to be honest. They discussed the status of a co-defendant. They also talked about rap music and a television show.

- 7 -

The detectives entered the room and Detective Keller noted that he had already issued the *Miranda* rights to the [Petitioner] but that he would review the rights again. He then confirmed that the [Petitioner] initiated the contact with the police, and the [Petitioner] identified the letter that Mr. Reynolds delivered to Detective Keller on the [Petitioner's] behalf. The [Petitioner] confirmed that the letter was in his handwriting and that he wrote the letter. The [Petitioner] waived his rights and signed the waiver. The [Petitioner] agreed that no coercion or threats had been used in order to obtain his statement. Detective Keller acknowledged Mr. Reynolds' presence in the room and told the [Petitioner] that Mr. Reynolds could be removed at any time. Another detective asked the [Petitioner] if he wanted his attorney present, and the [Petitioner] said no. The detective then confirmed with the [Petitioner] that he was willingly speaking with the detectives.

Detective Keller told the [Petitioner] that they would review the Williamson County home invasion case, the case at issue in this appeal, first and then the [Petitioner] was free to talk about any of the cases in other counties. The [Petitioner] agreed and recounted what occurred leading up to the home invasion and their entry into the Brentwood residence when Mr. Reynolds interrupted to ask to go the bathroom. After he exited the room, Detective Keller asked the [Petitioner] whether he wanted to continue without Mr. Reynolds in the room. The [Petitioner] responded that he wanted to continue with his statement. The [Petitioner] talked in a narrative manner about various offenses committed in other counties. He was occasionally interrupted with follow-up questions from the detectives. At one point, Mr. Reynolds questioned what the [Petitioner] was saying based upon a previous conversation between the two men at the jail. The [Petitioner], however, stood his ground as to his version of the events. Mr. Reynolds again left the room, and the [Petitioner] continued with the interview.

On the recorded video, the detectives left the room, and Mr. Reynolds and the [Petitioner] [were] left alone. The [Petitioner] ate while Mr. Reynolds told the [Petitioner], "Don't leave nothing out" and told him not to lie. He then talked about the food they ate and digestion. The detectives returned and the interview continued. Detective Keller told the [Petitioner] that he was free to talk about anything he wanted at that point in the interview. The [Petitioner] disclosed details about unrelated offenses.

After the [Petitioner] concluded his statements regarding offenses in other counties, the detectives left the room, leaving the [Petitioner] and Mr. Reynolds alone in the room. Mr. Reynolds told the [Petitioner] that he was concerned that the [Petitioner] had withheld information. The [Petitioner] claimed that he "isn't sure" about some of the information the detectives were asking him. He maintained that he did not know everyone's name involved and said that he had not seen one of the people discussed in six months. Mr. Reynolds then [left] the room and when he returned, the [Petitioner] was escorted to the bathroom. While the [Petitioner] was out of the room, Mr. Reynolds told Detective Keller that he was going to attempt to speak with "Quan," and Detective Keller responded that he could not assist or be involved in any way. The [Petitioner] re-entered the room during the discussion, and Mr. Reynolds [said] to the [Petitioner], "We are talking about Quan."

*Brian C. Frelix*, 2018 WL 2722796, at *3-4.

After the Williamson County court denied his motion to suppress, the Petitioner proceeded to trial and subsequently appealed the suppression issue. On appeal, this court considered the Petitioner's arguments that Mr. Reynolds was acting as a government agent and that his statements were obtained in violation of his right to counsel and were a product of coercion. *Id.* at *15. This court determined that Mr. Reynolds was not acting as a government agent:

In the present case, Mr. Reynolds initiated contact with Detective Keller after obtaining information from the [Petitioner]. The [Petitioner] was aware that Mr. Reynolds engaged in this type of behavior in an attempt to better position himself with regard to his own charges and yet still spoke with Mr. Reynolds about his involvement in the offenses. There is no evidence in the record that Detective Keller had any role in placing Mr. Reynolds in the [Petitioner's] cell. To the contrary, it appears that both men were in the cell due to their conduct while in jail. During the March 20 meeting, Mr. Reynolds expressed interest in "work[ing]" with the police and offered to try to speak with "Quan," a co-defendant. Detective Keller declined his assistance. Mr. Reynolds then asked if it would be helpful if he encouraged the [Petitioner] to reduce the information to writing, Detective Keller reiterated that he could not ask Mr. Reynolds to assist him in any way.

Accordingly, the [Petitioner] has failed to prove an explicit or implicit arrangement between Mr. Reynolds and Detective Keller for Mr.

Reynolds to act as an agent of the government while housed with the [Petitioner]. In the absence of proof showing that the government had agreed for Mr. Reynolds to act as a government agent in that meeting, there was no Sixth Amendment violation with respect to the incriminating statements made by the [Petitioner]. "[T]here is no infringement unless the informant was a government agent, and there is no agency absent the government's agreement [with] the informant for his services." *State v. Hernandez*, 842 S.W.2d 306, 316 (Tex. App. 1992) [(internal quotation omitted)]. The [Petitioner] is not entitled to relief as to this issue.

*Id.* at *17.

## Plea Hearing

After the Petitioner was convicted in Williamson County but prior to the appellate decision in his Williamson County convictions, he entered his guilty pleas to the 2013 and 2014 indictments in Davidson County. The prosecutor summarized the facts of the Belle Meade case by stating that the Petitioner and two co-defendants entered the victim's home and robbed her and that the Petitioner struck the elderly victim in the face with a pistol, leaving her with a wound requiring stitches. Several witnesses saw vehicles in the vicinity, including one with Ohio plates, and some witnesses were able to provide a description of the men who entered the home. The victim was able to identify both the Petitioner and Mr. Bertrand. Regarding the rape and robbery, the prosecutor stated that the victim was leaving her home when Mr. Bertrand forced his way in, stole her property, including a guitar, and raped her at gunpoint. Meanwhile, law enforcement had been called to investigate a suspicious vehicle in the area. The vehicle bore an Ohio license plate which did not belong to the vehicle, and the license plate was registered to the Petitioner. The Petitioner was standing by the vehicle and gave his name as "Brian Willis." The Petitioner pled guilty to aggravated robbery in the Belle Meade case and to facilitation of aggravated robbery in the rape and robbery case. He received an out-of-range sentence of sixteen years for aggravated robbery and a sentence of three years for facilitation of aggravated robbery, with his sentences to be served concurrently to each other and to his thirty-eight-year Williamson County sentence.

## Post-Conviction

At the post-conviction hearing, the Petitioner's post-conviction counsel noted that some communications between Detective Keller and Mr. Reynolds were not introduced at the Williamson County hearing on the motion to suppress and that he had requested these items in discovery but had not yet received them. Post-conviction counsel requested a continuance, but the State requested to proceed and to late-file the letters,

which were expected to arrive that afternoon. The post-conviction court concluded that the hearing would proceed "with the understanding that upon the late-filing of the letters from Williamson County[,] if [post-conviction counsel thinks] that there are additional issues[,] I am happy to revisit it."

The Petitioner testified that he would not have entered guilty pleas if trial counsel had filed a motion to suppress his Williamson County statements. The Petitioner reiterated his testimony from the Williamson County hearing that Mr. Reynolds threatened to kill his family and forced him to write the letters and speak to detectives. He stated that although his Williamson County attorney appealed the denial of the motion to suppress, he did not appeal the issue the Petitioner wished to address, which was whether the letters which had not been made exhibits at the Williamson County hearing established an agency relationship between Mr. Reynolds and law enforcement. He stated that Mr. Reynolds received a favorable resolution to his case and that Mr. Reynolds's communications with him were a violation of his Sixth Amendment rights. He argued that Detective Keller's providing stamps to Mr. Reynolds created an agency relationship and that the stamps were "never brought up." The Petitioner testified that he asked trial counsel to file a motion to suppress but that she told him it was "pointless" because the motion had been denied in Williamson County. He did not want to enter guilty pleas but felt that his confession would preclude acquittal at trial.

On cross-examination, he agreed that the victim in the Belle Meade robbery would have been able to testify against him and that one of his co-defendants in that robbery, Mr. Jones, would also have testified against him. Later, however, he testified that the victim could not identify him. He also asserted that Mr. Jones, Mr. Justin Howell (his co-defendant in another case), and Mr. Dobson would not have been discovered absent his confession. He was also aware that, had he gone to trial, he could have received sentences to be served consecutively to his lengthy Williamson County sentence.

Trial counsel testified that she began to represent the Petitioner in February 2015, and that the Petitioner told her that his main goal was to prolong his Davidson County cases until the resolution of his Williamson County cases so that he could negotiate concurrent sentences. Because the Davidson County prosecutor was focusing on the trial of Mr. Bertrand, trial counsel was able to continue the Petitioner's case. Trial counsel testified that the Petitioner did not ask her to file a motion to suppress, but she agreed that filing a motion to suppress would not have hurt the Petitioner's case. She testified that she discussed the suppression issue with the Petitioner's Williamson County attorney and that both felt that establishing that Mr. Reynolds was a State actor was a challenge. She agreed that constant communications between Mr. Reynolds and law enforcement would have been relevant on the issue. She did not independently investigate the suppression issue but relied on the Petitioner's Williamson County attorney's investigation. She

agreed that if the statement were suppressed, any "fruit" of the statement could likewise be excluded.

Trial counsel testified that there were several witnesses who would have testified against the Petitioner in the Belle Meade robbery, including co-defendants and the victim. She agreed that even if a motion to suppress had been filed and granted, the State would still have possessed sufficient evidence to proceed to trial. She testified that not filing a motion to suppress was in part a strategic decision to try to negotiate concurrent sentences for the Petitioner and that, in order to prevent the crimes from affecting the Petitioner's prison "points," she negotiated an out-of-range sentence for the aggravated robbery in place of consecutive sentences for the aggravated robbery and firearms offense in the Belle Meade robbery.

Detective Keller testified that Williamson County law enforcement had enough proof to make "a good case" against the Petitioner but that he nevertheless interviewed the Petitioner when Mr. Reynolds gave him a letter from the Petitioner indicating the Petitioner wanted to talk. He testified he received "at least two" letters from Mr. Reynolds but could not recall the contents of the correspondence. He stated he instructed Mr. Reynolds not to ask the Petitioner anything on his behalf and did not put money in Mr. Reynolds's commissary account. He initially stated he did not believe he gave Mr. Reynolds stamps but after refreshing his memory from the suppression hearing transcript, he recalled giving Mr. Reynolds two stamps so that Mr. Reynolds could maintain contact. The second time Detective Keller met with Mr. Reynolds, Mr. Reynolds gave him the Petitioner's letter, in which the Petitioner requested to talk with law enforcement. He gave further testimony consistent with his testimony at the suppression hearing.

The letters from the Petitioner and Mr. Reynolds to law enforcement in Williamson County included Mr. Reynolds's initial letter to law enforcement written on March 12, 2014, which was introduced at the Williamson County hearing on the motion to suppress. In the letter, Mr. Reynolds detailed items the offenders took from the Belle Meade victim's refrigerator and stated he had information about the Williamson and Davidson County offenses. The Petitioner's March 21, 2014, letter to law enforcement was also introduced at the suppression hearing. In the letter, the Petitioner requested to speak to law enforcement in the presence of Mr. Reynolds and without his attorney. The Petitioner's March 30, 2014 letter, which was also introduced at the suppression hearing, affirmed that his statements in the March 26, 2014, interview had been true with the exception of a statement that Mr. Howell assaulted the victim.

The late-filed letters which were not introduced at the Williamson County suppression hearing included a March 20, 2014, letter from Mr. Reynolds postmarked March 22, 2014. In this letter, Mr. Reynolds asked to be transported to speak with

Detective Keller, stating he had more information regarding the crimes, in particular noting that the guitar taken during one robbery was acoustic. On March 25, 2014, Mr. Reynolds again wrote to Detective Keller, stating that he knew the location of the gun used by the co-defendant in the aggravated rape. There was also a letter from Mr. Reynolds on March 30, 2014, written after the Petitioner had confessed the crimes. Mr. Reynolds stated that he wanted to be moved and stated that the Petitioner was angry at him. He asserted the Petitioner had not been entirely truthful and asked to speak to authorities, noting that it would "[b]e nice to have a few candy bars" and other food items. He stated that he had a letter from the Petitioner to Mr. Bertrand and that he intended to get the Petitioner to write a letter that he "lied some" in the interview. Mr. Reynolds's judgments in the cases pending against him in Williamson County were entered on April 1, 2014.

The Petitioner argued that the evidence regarding stamps combined with the evidence of the additional forthcoming letters would have resulted in suppression of the confessions. The State asked the post-conviction court to deny the petition "or don't[;] the State is still ready for trial."

The post-conviction court denied the post-conviction petition, finding that the failure to file a motion was not deficient because trial counsel reasonably investigated the motion and was acting in accordance with the Petitioner's stated goal to delay proceedings and attempt to negotiate a concurrent sentence. The post-conviction court further found that the Petitioner failed to prove prejudice. The court noted that the Petitioner did not want to proceed to trial but wanted to negotiate a concurrent sentence. Furthermore, the post-conviction court found that the Petitioner had not shown that the results of a motion would have been favorable. The post-conviction court further found that the pleas were not involuntary and denied relief. The Petitioner appeals.

## ANALYSIS

### I. Ineffective Assistance in the Failure to File a Motion to Suppress

The Petitioner contends that trial counsel's failure to file a motion to suppress constituted ineffective assistance of counsel meriting post-conviction relief. The findings of fact made by a post-conviction court are conclusive on appeal unless the evidence preponderates against them. *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010). This court may not substitute its own inferences for those drawn by the post-conviction court, and questions concerning the credibility of witnesses, the weight and value of the evidence, and the factual issues raised by the evidence are to be resolved by the post-conviction court. *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001). A post-conviction court's conclusions of law and determinations of mixed questions of fact and

law, such as whether a petitioner received ineffective assistance of counsel, are reviewed de novo. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

A petitioner is entitled to post-conviction relief when a conviction or sentence is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The petitioner bears the burden of proving the allegations of fact in the petition by clear and convincing evidence. T.C.A. § 40-30-110(f). Evidence is clear and convincing when the correctness of the conclusions drawn from the evidence admits no serious or substantial doubt. *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009).

The right to counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008). The right to counsel encompasses "the right to 'reasonably effective' assistance, that is, assistance 'within the range of competence demanded of attorneys in criminal cases.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). In evaluating a claim of ineffective assistance of counsel, the court must determine whether counsel's conduct "'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.'" *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 686).

To show that relief is warranted on a claim of ineffective assistance of counsel, the petitioner must establish both that counsel's performance was deficient and that the deficiency prejudiced the defense. *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007). Deficiency requires showing that counsel's errors were so serious "that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To demonstrate deficiency, the petitioner must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Pylant*, 263 S.W.3d at 868. Courts must make every effort "'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Felts*, 354 S.W.3d at 277 (quoting *Strickland*, 466 U.S. at 689). The reviewing court must begin with "the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all strategic and tactical significant decisions." *Davidson v. State*, 453 S.W.3d 386, 393 (Tenn. 2014).

In determining prejudice, the post-conviction court must decide whether there is a reasonable probability that, absent the errors, the result of the proceeding would have been different. *Grindstaff*, 297 S.W.3d at 216. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Honeycutt*, 54 S.W.3d

at 768 (quoting *Strickland*, 466 U.S. at 694). "That is, the Petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." *Finch*, 226 S.W.3d at 316.

The *Strickland* standard for determining whether a petitioner received the ineffective assistance of counsel applies in plea negotiations as well as during trial. *Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *see also Missouri v. Frye*, 566 U.S. 134, 147 (2012). In order to show prejudice in the context of a guilty plea, the petitioner must demonstrate "'a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial.'" *Grindstaff*, 297 S.W.3d at 217 (quoting *Hill*, 474 U.S. at 59). The inquiry should focus on whether any alleged deficiency affected the outcome of the plea process. *Id.* To establish ineffective assistance in the failure to file a motion, the Petitioner must demonstrate a reasonable probability that, had the motion been filed, the outcome of the proceeding would have been different. *Vaughn v. State*, 202 S.W.3d 106, 120 (Tenn. 2006), *abrogated on other grounds by Brown v. Jordan*, 563 S.W.3d 196, 202 (Tenn. 2018). A claim may be denied for failure to prove either deficiency or prejudice, and a court need not address both prongs if the petitioner has failed to establish one prong. *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

The Petitioner contends that trial counsel was deficient in failing to file a motion to suppress. He asserts that filing a motion would have resulted in suppression of "the entirety of the State's case" and that "new evidence," which consists of the letters and of evidence that Detective Keller gave Mr. Reynolds stamps, reveals that the State compensated Mr. Reynolds for his acts. He also asserts he would not have pled guilty had the evidence been suppressed. We conclude that the Petitioner has not demonstrated that failing to file a motion to suppress was deficient and that he cannot show prejudice.

The post-conviction court credited the testimony of trial counsel, who testified that she investigated the suppression issue by speaking with the Petitioner's Williamson County counsel regarding various issues surrounding the statements. The motion to suppress had been denied in Williamson County, and trial counsel believed it would be difficult to show that Mr. Reynolds was acting as an agent of the State. The Petitioner's primary goal was to delay his Davidson County proceedings so that he could obtain concurrent sentencing with his Williamson County convictions. Trial counsel observed that the State had ample evidence to proceed even without the incriminating statements. In the robbery during which the victim was raped, the Petitioner was indicted prior to speaking with Williamson County authorities. In the Belle Meade robbery, the victim and other witnesses were able to identify the Petitioner. We conclude that it was not deficient for trial counsel to decline to attempt to relitigate the nondispositive suppression issue in Davidson County and instead to attempt to accomplish the Petitioner's stated goal of negotiating concurrent sentences.

- 15 -

The State argues that the Petitioner cannot demonstrate prejudice without introducing the omitted letters. However, the letters omitted from the Williamson County hearing are clearly part of the record on appeal, having been filed as part of late-filed Exhibit 9 with the post-conviction court. Nevertheless, we conclude the Petitioner cannot show prejudice. While the Petitioner asserts that the newly introduced letters are relevant to the determination of whether there was an agency relationship, we conclude that they are merely duplicative of proof already considered by this court and the Williamson County court in determining the issue.

Of the three omitted letters, one was written and postmarked March 30th, after the Petitioner's challenged statements to law enforcement. This letter contained Mr. Reynolds's request to be moved away from the Petitioner, an assertion that Mr. Reynolds had a letter written by the Petitioner to Mr. Bertrand, a request to speak to officers about inaccuracies in the Petitioner's statement, a statement of Mr. Reynolds's intention to try to persuade the Petitioner to write to Detective Keller, and a request for candy bars. The March 20th letter consisted of Mr. Reynolds's assertion that he could provide additional information and contained the fact that the guitar taken was acoustic. The March 25th letter also contained assertions that Mr. Reynolds had valuable information, including information about other robberies and the weapon used in the rape. As this court noted in the appeal of the Williamson County court's decision on the suppression issue, "'there is no agency absent the government's agreement [with] the informant for his services.'" *Brian C. Frelix*, 2018 WL 2722796, at *17 (quoting *Hernandez*, 842 S.W.2d at 316); *see State v. Willis*, 496 S.W.3d 653, 710 (Tenn. 2016) (holding that to establish agency, a defendant must show that the State "manifested assent, either explicitly or implicitly, to have the cooperating witness act as a government agent, and that the State had some level of control over the witness's actions with respect to the defendant"). We observe that there was no new communication from Mr. Keller to Mr. Reynolds and that nothing in Mr. Reynolds's letters indicated that he was being directed to act or compensated for eliciting information. Although the Petitioner describes the evidence regarding the stamps as new, this court on appeal specifically noted that Detective Keller gave Mr. Reynolds two stamps. *Brian C. Frelix*, 2018 WL 2722796, at *1. We conclude that the letters contain no new information that would bear on an agency relationship. *See Willis*, 496 S.W.3d at 712 ("Evidence that [the informant] reached out to law enforcement officers does not equate to evidence of actions by law enforcement officials manifesting assent to have [the informant] act as a government agent...."). Accordingly, the appellate court, when it reviewed the videos of the March 20th and 26th meetings with Detective Keller, had all the existing evidence pertinent to any agreement made by the government, acting through Detective Keller, with Mr. Reynolds. This court reviewed the evidence and concluded that Mr. Reynolds was not a State agent. *Brian C. Frelix*, 2018 WL

2722796, at *17.  Accordingly, the Petitioner cannot establish prejudice in counsel's choice not to file a motion to suppress.

Furthermore, contrary to the Petitioner's assertions, the proof at the plea hearing and post-conviction hearing established that the State had ample evidence to proceed with prosecution even without his statements.  This evidence included victim identification, the Petitioner's license plate on a vehicle involved in one crime, the Petitioner's interaction with an officer at the rape scene, and testimony from co-defendants.  While the Petitioner claims that the co-defendants were discovered through his Williamson County statements, there was no proof on the issue introduced at the hearing, and the 2013 indictment reflects that Mr. Bertrand and Mr. Dobson were both indicted prior to the statements.  The post-conviction court credited the testimony of trial counsel, who testified that the Petitioner did not want to go to trial but primarily wanted to negotiate concurrent sentences with his Williamson County cases.  Accordingly, the Petitioner has not demonstrated a reasonable probability that, had trial counsel filed a motion to suppress, he would not have pled guilty and would have insisted on going to trial.  *See Grindstaff*, 297 S.W.3d at 217.

## II.  Sixth Amendment Violation

The Petitioner next asserts that his Sixth Amendment rights were violated because Mr. Reynolds, acting as a State agent, interrogated him.  The State contends that the issue is waived because it is raised for the first time on appeal and because it was not presented for determination before a court of competent jurisdiction when the opportunity was available.  *See* T.C.A. § 40-30-106(g).  The Petitioner responds that the issue is not waived because the State failed to produce the additional letters until after the post-conviction proceeding.  We conclude that the issue has been previously determined and that the Petitioner is not entitled to relief.

We note initially that the Petitioner clearly asserted in his post-conviction petition that he was seeking relief for a Sixth Amendment violation as well as ineffective assistance of counsel, elaborating that his "Sixth Amendment rights were triggered the moment [Mr. Reynolds] questioned [the Petitioner], without the presence of counsel." Although the State asserts the Sixth Amendment claim was merely part of the claim of ineffective assistance of counsel, the petition divides the two claims into separate subheadings and asserts the Petitioner's right to counsel was violated because Mr. Reynolds interrogated him in jail. Accordingly, the issue is not, as the State asserts, waived for failure to raise it below.

During the Williamson County suppression proceedings, the Petitioner "filed a motion to suppress, asserting that his Fifth, Sixth, and Fourteenth amendment rights had

been violated." *Brian C. Frelix*, 2018 WL 2722796, at *1. This court subsequently addressed on appeal both whether his Sixth Amendment right was violated when Detective Keller interviewed him and whether Sixth Amendment right was violated because Mr. Reynolds was an agent of the State. Both claims were rejected. *Id.* at *15-19. In particular, this court determined that "[i]n the absence of proof showing that the government had agreed for Mr. Reynolds to act as a government agent in that meeting, there was no Sixth Amendment violation with respect to the incriminating statements made by the [Petitioner to Mr. Reynolds]." *Id.* at *17.

The post-conviction court may dismiss a claim if it has been previously determined. T.C.A. § 40-30-106(f). An issue has been previously determined "if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence." T.C.A. § 40-30-106(h). Here, it is clear that a court of competent jurisdiction determined the issue of whether the Petitioner's Sixth Amendment rights were violated by Mr. Reynolds's attempts to elicit information from him. The Petitioner participated in a full and fair hearing where correspondence between the parties was introduced, video evidence of communications between Mr. Reynolds and Detective Keller was introduced, and numerous witnesses testified. The trial court's determination regarding the agency issue was appealed, and this court affirmed the determination that "[i]n the absence of proof showing that the government had agreed for Mr. Reynolds to act as a government agent in that meeting, there was no Sixth Amendment violation…." *Brian C. Frelix*, 2018 WL 2722796, *17. The appellate determination became a final judgment. *See State v. Bruce D. Mendenhall*, No. M2018-02089-CCA-R3-CD, 2020 WL 2494479, at *1 (Tenn. Crim. App. May 14, 2020) (the defendant was collaterally estopped from relitigating a suppression issue which had been decided in another county and affirmed on appeal), *perm. app. filed*; *State v. Larry O. Luffman and Jerry O. Myatt*, No. C.C.A. 88-272-III, 1990 WL 113248, at *5 (Tenn. Crim. App. Aug. 9, 1990). This issue has been previously determined, and the Petitioner is not entitled to relief.[1] We

---

[1] In addressing whether his Sixth Amendment claim has been waived for failure to present it in prior proceedings, *see* T.C.A. § 40-30-106(g), the Petitioner asserts that the State failed to provide timely discovery and cites in his reply brief to *Brady v. Maryland*, 373 U.S. 83 (1963) (holding that the prosecution's suppression of evidence favorable to the accused is a violation of due process where the evidence is material either to guilt or to punishment). The post-conviction court noted at the hearing that it would permit the Petitioner to revisit the proof after the letters were filed if the Petitioner felt it was necessary, but the issue was not revisited. The Petitioner provides no analysis related to a *Brady* claim. Accordingly, insofar as these issues are raised independently, they are waived. *See* Tenn. R. App. P. 36(a); *State v. Hester*, 324 S.W.3d 1, 80 (Tenn. 2010) (an issue may be waived for failure to include argument); *State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) (issues first raised on appeal are waived).

have examined above, through the analytical framework of ineffective assistance of counsel, the Petitioner's claim that trial counsel's failure to present the additional letters affected the suppression issue.

## CONCLUSION

Based on the foregoing, we affirm the post-conviction court's judgment.


_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE